**HOECHST CELANESE CORPORATION and Hoechst Celanese Chemical Group Inc.**

v.

**BP CHEMICALS LIMITED.**

Civ. A. No. G–92–499.

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 24, 1994.

John F. Lynch, Arnold White & Durkee, Houston, TX, for plaintiff.

Edward J. Patterson, Jr., Robert Stevens De Lange, Royston Rayzor Vickery & Williams, Galveston, TX, for defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

KENT, District Judge.

The Plaintiffs (collectively, "Celanese") brought this suit for a declaration that their operations for the production of acetic acid do not infringe United States Patent No. 5,003,104 ("the '104 patent"). The '104 patent is owned by Defendant BP Chemicals ("BP"). BP has counterclaimed for infringement, seeking over $180,000,000 in damages. Before the Court are Celanese's motions for summary judgment on the grounds that (1) the patent is invalid, and (2) they are licensed to use the patent, and BP's motion to open and close the evidence at trial. The Court **DENIES** summary judgment based on the validity of the '104 patent, but **GRANTS** summary judgment based on Celanese's license, rendering all other issues of substantive liability and trial procedure **MOOT**.

### I. Background

In 1975 Celanese entered a license agreement with the Monsanto Company, whereby Celanese acquired the right to use certain technical information in order to construct its Clear Lake City plant for the production of acetic acid. In general, the license granted Celanese the right to make acetic acid by carbonylating methanol with carbon monoxide in the presence of a rhodium and iodine catalyst system. In particular, Monsanto granted Celanese the right to use the processes claimed in various categories of patents and pending patent applications which Monsanto owned at the time of the agreement, in exchange for a royalty on acetic acid produced with those processes. There is no dispute that Celanese has paid the specified royalty on all of the acetic acid production relevant to this case.

In 1984, Celanese altered its technique for making acetic acid at the Clear Lake plant, adding a lithium iodide catalyst to the procedure. In 1986, BP purchased Monsanto's intellectual property rights related to acetic acid manufacture. BP filed the application for the '104 patent in 1988, claiming as an effective filing date the 1973 filing date of a patent application which had been assigned to Monsanto ("the '73 application"). The '104 patent issued in 1991, claiming patent rights over the same lithium iodide process that Celanese uses. BP now asserts, over Celanese's denial, that the patent is valid, that Celanese does not have a license to use the patent, and that Celanese's use of the lithium iodide process infringes the patent.

### II. Validity

Although the Court finds Celanese's motion with respect to validity to be unsustainable, a detailed discussion of the issue is necessary in order to understand the Court's reasoning with respect to the license issue.

By the 1988 filing date of the '104 patent, the relevant processes claimed therein were definitively anticipated under 35 U.S.C. § 102. Accordingly, BP has conceded—by

deposition testimony and through arguments to the United States Patent and Trademark Office—that the '104 patent is valid only if it can obtain the benefit of the filing date of Monsanto's '73 application. In order to do so, BP asserts here, as it did before the Patent Office, that the application for the relevant claims of the '104 patent constituted a continuation of the '73 application, through four intervening patent applications, under 35 U.S.C. § 120.

## A. Pre–Dating the '104 Patent

Section 120 provides that a patent application obtains the benefit of the filing date of an earlier application by the inventor if the prior application sufficiently disclosed the invention now claimed, in the manner specified by the first paragraph of 35 U.S.C. § 112. Section 112 ¶ 1, in turn, provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same....

This paragraph imposes two distinct requirements for a patent application: a written description of the invention, and the more narrow "enablement" specifications. *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed.Cir.1991). The "enablement" criteria, which teach one skilled in the art how to "make and use" the invention, are not at issue here. Rather, Celanese claims that the "written description" of the '73 application does not support the claims of the '104 patent.

■ The written description requirement under § 120 is clearly established: for the written description of an earlier "parent" application to support later claims, the parent's description must have reasonably conveyed to an artisan that the inventor had possession, at that time, of the later claimed invention. *Id.; Wang Laboratories, Inc. v. Toshiba Corp.*, 993 F.2d 858, 865 (Fed.Cir.1993); *Ralston Purina Co. v. Far–Mar–Co, Inc.*, 772 F.2d 1570, 1575 (Fed.Cir.1985).

Monsanto's '73 application described:

> ... an improved process for the production of carboxylic acid anhydrides by contacting carbon monoxide with an ether and/or an ester in the presence of a rhodium compound and a halogen component. The halogen component is iodine, bromine, an iodide compound or a bromide compound. The contacting is carried out under substantially anhydrous conditions....

The specification of the '73 application further describes alcohols as contaminants, which should be removed from the feed components to ensure successful use of the process, and teaches that "the reaction of this invention must be carried out under substantially anhydrous [ (water-free) ] conditions to maximize the production of the desired carboxylic anhydride product."

Claim 1 of the '104 patent claims:

> [a] process for the carbonylation of a carbonylatable reactant selected from the group consisting of alkyl esters, dialkyl ethers, alkyl alcohols, and olefins by reacting same with carbon monoxide ... in the presence of a solution containing a rhodium compound and lithium iodide....

The '104 patent's other independent claim, Claim 9, differs from Claim 1 in that the suitable carbonylatable reactants are not specified, and methyl acetate is added to the solution. Claim 1 describes the process used by Celanese to make acetic acid: the carbonylation of an alcohol in the presence of rhodium and lithium iodide.

Superficially, at least, the '104 patent appears to claim an invention substantially different from that described in the '73 application. Unlike the '73 application, the '104 patent is not limited to the production of carboxylic acid anhydrides, and in fact covers the production of carboxylic acids, such as acetic acid. Claim 1 of the '104 patent adds alcohols (and olefins) as possible reactants, whereas alcohols were described as contaminants in the '73 application. Conversely, Claim 9 does not limit the type of reactant at all, while the '73 application described only esters and ethers. The '104 patent does not require anhydrous conditions for its optimal use, as did the '73 application; in fact, in Example 18 the '104 application describes the

340

addition of water as beneficial for the production of acetic acid.

Nonetheless, the patent examiner presumptively concluded that one skilled in the art would have recognized that the '73 application clearly disclosed that Monsanto had invented those claims ultimately included in the '104 patent. *Cf. Ralston Purina*, 772 F.2d at 1573–74 (presumption of validity extends to compliance with § 112).

To support this conclusion, BP has offered the opinion of a distinguished chemist, Dr. F.A. Cotton. As to Claim 9, Dr. Cotton points out that all of the specific elements of Claim 9 are described in the '73 application. However, Dr. Cotton's analysis neglects to address the fact that the '73 application limits itself to esters and ethers as the carbonylatable reactants, and limits its function to the production of anhydrides, whereas Claim 9 permits the use of *any* reactant, for *any* type of carbonylation process. That Claim 9 is so broad as to encompass the process described in the '73 application does *not* mean that the application *described* the breadth of Claim 9. Rather, the Federal Circuit and its predecessor courts have repeatedly stated that, while the description of an invention using a given species may *enable* the practice of an invention using any of the genus to which that species belongs, it does not necessarily *describe* the broader invention. *Vas–Cath*, 935 F.2d at 1561–62. In fact, a parent application's disclosure of the use of a chemical species can even be prior art against a subsequent claim to the encompassing genus, while still not *describing* the genus so as to allow the later claim to assert the parent's filing date. *Chester v. Miller*, 906 F.2d 1574, 1577 (Fed.Cir.1990); *In re Gosteli*, 872 F.2d 1008 (Fed.Cir.1989); *In re Lukach*, 442 F.2d 967, 968–70 (C.C.P.A. 1971); *see In re DiLeone*, 436 F.2d 1033, 1034 (C.C.P.A.1971) (*DiLeone I* ) (affirming rejection of claim encompassing broad chemical class, where specification described only a species); *In re Ahlbrecht*, 435 F.2d 908, 910–12 (C.C.P.A.1971) (affirming rejection of § 120 claim because later application described broader class of esters than that described in parent application); *In re Ruscetta*, 255 F.2d 687 (C.C.P.A.1958) (affirming rejection of § 120 claim because parent description of method of etching tantalum did not describe use of method with other metals of same class, even though such use would have been obvious to try).

Dr. Cotton's analysis of the '73 application with respect to Claim 1 also ignores the relevant legal test, confusing the description requirement for the enablement requirement. Dr. Cotton asserts that:

> In my opinion, the '73 application reasonably conveys to one skilled in the art on August 27, 1973 that the rhodium catalyst systems described in the '73 application, including the rhodium-lithium iodide catalyst system of claim 1, were suitable for use in the then well-known carbonylation of alkyl **alcohols** and **olefins.**

Dr. Cotton supports this opinion with evidence that the rhodium-catalyzed carbonylation of alkyl alcohols and olefins was well-known at the time. He further contends that the '73 application's description of alcohols and water as contaminants in "the production of the desired anhydride product" is "not inconsistent" with this opinion, because it was readily understood that carbonylation of alcohols in the presence of carbon monoxide and a rhodium-halide catalyst yielded carboxylic acids. Therefore, according to the opinion's logic, once the '73 application revealed the use of lithium iodide in a specific rhodium-catalyzed carbonylation process, an artisan would have recognized that the catalyst was also "suitable" for use in other rhodium-catalyzed carbonylation processes.

█ As discussed above, however, the test for the written description requirement is not whether a skilled artisan *would have known* that lithium iodide was "suitable" in similar processes; the test is whether the artisan would have known, from reading the description, that the *inventor* of the '73 application *did know* of this suitability—and hence had possession of this invention. One oft-quoted example of this distinction is:

> [C]onsider the case where the specification discusses *only* compound A and contains *no* broadening language of any kind. This might very well enable one skilled in the art to make and use compounds B and C;

yet the class consisting of A, B, and C has not been described.

*In re DiLeone*, 436 F.2d 1404, 1405 n. 1 (C.C.P.A.1971) (*DiLeone II* ). By analogy, Dr. Cotton's testimony teaches that an artisan would have known that, in order to make carboxylic acids, alcohols and olefins might be used in place of esters and ethers in the anhydride-making process described by the '73 application. This is not evidence, however, that the acid-making process has been described. "That a person skilled in the art might realize from reading the disclosure that such a step is *possible* is not sufficient indication to that person that the step is part of the applicant's invention." *In re Winkhaus*, 527 F.2d 637, 640 (C.C.P.A.1975) (affirming rejection of broadening amendment).

This does not mean, of course, that subsequent claims can never broaden the specific or literal aspects of an initial description. Such breadth, however, should have been immediately clear to any artisan reading the original description. For example, the following counter-illustration to the above "A,B,C" scenario has been offered:

> If the original specification of a patent application on the scales of justice disclosed only a 1–pound *"lead* weight" as a counterbalance to determine the weight of a pound of flesh, we do not believe the applicant should be prevented by the [description requirement] from later claiming the counterbalance as a "metal weight" or simply as a 1–pound "weight," although both "metal weight" and "weight" would indeed be progressively broader than "lead weight".... The broader claim language would be permitted because the *description of the use and function* of the lead weight as a scale counterbalance in the *whole disclosure* would immediately convey to any person skilled in the scale art the knowledge that the applicant invented a scale with a 1–pound counterbalance weight, regardless of its composition.

*In re Smythe*, 480 F.2d 1376, 1384 (C.C.P.A. 1973). Likewise, the patent court has held that a description directing the use of "adhesives" in the construction of an invention supported the broader phrase "adheringly applying" in an amended claim. *In re Rasmussen*, 650 F.2d 1212 (C.C.P.A.1981) (reversing a claim rejection by the Patent Office). "[O]ne skilled in the art who read [the applicant's] specification would understand that it is unimportant *how* the layers are adhered, so long as they are adhered." *Id.* at 1215.

The case at bar, however, does not concern a quibble over the obvious breadth of an insignificant portion of the parent description. The entire '73 application described a very specific process for the production of *carboxylic acid anhydrides* by contacting carbon monoxide with an *ether* and/or an *ester* in the presence of a rhodium compound and a halogen, under *substantially anhydrous* and *alcohol-free* conditions. BP would have the Court believe that this description clearly conveyed to one skilled in the art of carbonylation that the inventor had necessarily formulated a process for *any* carbonylation with carbon monoxide, including for the production of *carboxylic acid;* with *any* reactant, including, in addition to ethers and esters, *alcohols* and *olefins;* with *no* restriction to anhydrous conditions. Frankly, from a layman-judge's perspective, the Court finds that the proposition itself explores the limits of credibility. It appears overwhelmingly likely that the patent examiner could have found the original description to be sufficient only by applying the same incorrect legal standard utilized by Dr. Cotton.

## B. Summary Judgment

■ Nonetheless, summary judgment cannot issue on the record before the Court. Summary judgment is only appropriate if the moving party demonstrates the absence of any genuine issue of material fact. Fed. R.Civ.P. 56. A fact issue is "genuine" if the non-movant's evidence is such that a reasonable fact finder could decide the issue in the non-movant's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Whether the description requirement has been met by a parent application is

a question of fact. *Vas–Cath,* 935 F.2d at 1563; *Gosteli,* 872 F.2d at 1012. Furthermore, it is axiomatic that a patent is presumed valid, and the fact that a patent issued is probative evidence of a patent's validity. *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1555 (Fed.Cir.1985). Therefore, the simple existence of the '104 patent is itself evidence that the patent's claims are supported by the written description in the '73 application.

It is unclear whether a patent will itself always be *sufficient* evidence to create a genuine issue of compliance with the description requirement. The Federal Circuit *has* implicitly indicated, however, that summary judgment of invalidity will rarely be the correct result. Simply as an empirical matter, this Court has surveyed the numerous opinions of the Federal Circuit published since 1990 in which the Circuit reviewed district court grants of summary judgment of invalidity on any grounds. The Circuit reversed all but two. In one case, all of the facts relevant to the legal issue in question were either stipulated or undisputed. *Ryko Mfg. Co. v. Nu–Star, Inc.,* 950 F.2d 714 (Fed.Cir. 1991). The other case concerned a claim of invalidity based on unrebutted evidence of the prior public use and sale of the claimed invention by the patentee, a fact inquiry not likely to be considered by the patent examiner. *Sinskey v. Pharmacia Ophthalmics, Inc.,* 982 F.2d 494 (Fed.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2346, 124 L.Ed.2d 256 (1993).

Indeed, the Court has found no case in which an appellate patent court found a relation-back patent to be invalid as a matter of law. Rather, in each case the court simply affirmed the conclusions of a fact-finder, based on the principles discussed above. *E.g. Ruscetta, supra* (Celanese's primary authority).

More to the point, the Federal Circuit has reversed a summary judgment of invalidity in at least one case facially similar to the one at bar. *Vas–Cath,* 935 F.2d at 1565. In *Vas–Cath,* the District Court had found on summary judgment motion that the drawing of a dual-tube catheter in a design patent application provided insufficient support for a later patent application which described a range of possible diameters for each tube. The District Court reasoned that the single drawing necessarily excluded other possible diameter ratios, and hence did not disclose those ratios. *Id.* at 1566. The inventor, however, had submitted expert testimony that one skilled in catheter design would have understood that the tubes could have the narrow range of diameters later claimed. The Circuit Court held that, as this unrefuted evidence addressed the proper legal question, it created a genuine issue of material fact precluding summary judgment. *Id.* at 1566–67.

*Vas–Cath* is distinguishable from the issue at hand in that this Court has already observed that BP has *not* presented evidence that, from the "acid anhydride" description in the '73 application, one skilled in the art of carbonylation in 1973 would have understood that Monsanto's assignor had invented the generic processes claimed in the '104 patent. On the other hand, however, Celanese has not presented evidence that the application would *not* have conveyed this information to the artisan.[1]

■ Even if summary judgment of invalidity over facts implicitly found by the patent examiner would ever be appropriate, it cannot be appropriate on a record devoid of evidence controverting those implied findings. As the patent challenger, Celanese bears the burden of proving the "not described" fact by clear and convincing evidence. *Ralston Purina,* 772 F.2d at 1573–74. At a minimum, this standard requires the challenger to come forward with prima facie evidence of invalidity. *Id.* Although the Court finds Celanese's argument to be overwhelmingly sensible, even this conclusion cannot be based on the correct legal standard: the Court's view in this regard is that of layperson, rather than that of a carbonylation artisan. Because no evidence in the record supports a finding of invalidity, much

---

1. BP has introduced the deposition of its own licensing expert, who testified that the '73 application did not describe the claims of the '104 patent. There is no evidence, however, that this witness was skilled in the art of carbonylation in 1973.

less conclusively proves such a finding, Celanese's motion for summary judgment of invalidity is **DENIED**.

### III. License

The 1975 license agreement between Celanese and Monsanto designated its relevant general scope in Article I:

1.01—The FIELD OF THIS AGREEMENT shall mean the process and equipment for the production of acetic acid by way of a carbonylation reaction wherein methanol is reacted with carbon monoxide in the presence of a rhodium and iodine containing catalyst system, [and] for the purification and recovery of acetic acid so produced....

Article II of the agreement specifies various generic categories of information which are included within the license. These categories embraced several classes of patents and patents pending, including in particular the following:

2.06—MONSANTO agrees to grant ... a license under any of its United States patents and patent applications within the FIELD OF THIS AGREEMENT bearing filing dates prior to the DATE OF THIS AGREEMENT for the sole purpose of and only to the extent necessary for LICENSEE to use technical improvements developed by LICENSEE for the production of acetic acid in the PLANT, provided that LICENSEE agrees that all acetic acid produced in LICENSEE'S PLANT incorporating such improvements shall be subject to the royalty provisions set forth in Article III of this Agreement.

Celanese argues that its use of lithium iodide in the reaction process is a "technical improvement" it developed, within the meaning of section 2.06; that this provision unambiguously granted Celanese a license to use this improvement if it were claimed by the '73 application; and that, by extension, the clause must have granted a license to use the '104 patent.

2. Section 9.01 of the license agreement provides that the interpretation of the agreement will be governed by Texas law and, by citing Texas case

### A. Contract Interpretation

■■■ Under Texas law,[2] a fact issue arises as to the proper interpretation of a written contract only if the contract is ambiguous. *In re Fender*, 12 F.3d 480, 489 (5th Cir.1994). In general, a document is ambiguous only when it is reasonably susceptible to more than one meaning. *Id.* An agreement is not ambiguous merely because the parties disagree upon its correct interpretation; it is ambiguous only if both interpretations are reasonable. *D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir. 1992) (applying Texas law).

In this case, both parties agree that the license agreement is unambiguous, although both put forth different interpretations. The Court agrees that the clauses at issue are susceptible to only one reasonable interpretation, and therefore the Court must interpret the contract as a matter of law.

### B. Field of the Agreement

■■ One reason that the '104 patent is not licensed, BP argues, is that the '73 application was not within the license's "Field of This Agreement" as defined in § 1.01. BP makes this bold claim with the reasoning that the '73 application pertains to a process for the production of acetic *anhydride*, while the "Field" of the license agreement is limited to acetic *acid* production.

■■ In light of the validity discussion above, this argument is patently ridiculous. The license agreement is only relevant to the disposition of this case if the '104 patent is valid. The '104 patent is valid only if the '73 application described those claims made in the '104 patent. Celanese's acid-making process would be infringing the '104 patent only if the patent claims a process for making acetic acid. Therefore, if the '104 patent *is* valid, then the '73 application necessarily described a process for making acetic acid, and was within the field of the agreement. Conversely, if—as BP argues—the '73 application did not describe a process for making acetic acid, then the '104 patent is per se

authorities, the parties implicitly agree to the enforcement of this provision.

invalid. Either way, "absurd" is the only proper accolade for BP's attempt to simultaneously maintain that the '73 application described the acid-making claims of the '104 patent, yet did not claim an acid-making process within the meaning of the license agreement.[3]

Equally ludicrous is the assertion of BP and its experts that the lithium iodide process was excluded from the license agreement because it was part of Monsanto's non-commercial R & D work. Generally, the license does exclude this category of material from its general definition of the technical information licensed. Section 2.06, however, clearly created an exception to this exclusion, granting Celanese a license to use any "technical improvements" which it developed on its own, if those improvements were the subject of Monsanto patents or patent applications bearing filing dates prior to the date of the agreement. BP never contests that the lithium iodide process is exactly the type of "technical improvement" in the acid-making process envisioned by § 2.06. Whether this process was simultaneously the subject of Monsanto's R & D work is entirely irrelevant.

BP attempts to rebut this interpretation of § 2.06 with evidence of the circumstances surrounding the negotiations of the 1975 agreement. This evidence shows that Monsanto initially offered only to license its commercial process, and not any of its R & D work or future patents. Celanese then asked for a license for certain future patents, but Monsanto agreed only to the inclusion of § 2.06.

Inexplicably, BP argues that these circumstances support its argument that the R & D exclusions "confirm" its reading of § 2.06. If anything, however, this evidence confirms the Court's interpretation, based on the clear language of the license agreement taken as a whole, that § 2.06 was added as an exception to the contract's general reservation of rights

in non-commercial R & D work. Section 2.06 clearly states that, if Celanese independently develops technical improvements which are subject to Monsanto's patent applications filed before 1975, then Celanese is licensed to use those improvements.

## C. The Licensing of Continuations

■ Assuming that the '104 patent is valid, and therefore that use of the '73 application was licensed to Celanese under § 2.06, the only debatable question on the license issue is whether this necessarily means that the '104 patent is also licensed. Section 2.06 grants a license for the described patents and patent applications "bearing filing dates" prior to the 1975 date of the agreement. Although the '104 patent is valid only if it obtains the *effective* filing date of the '73 application, technically the '104 patent "bears" a 1988 filing date. Therefore, BP argues, the '104 patent falls outside the literal terms of § 2.06's grant.

Celanese counters that such an interpretation would lead to blatantly irrational results, while serving no countervailing benefit to either party beyond granting the licensor the option of perpetrating a legally sanctioned fraud. The Court agrees. In order for § 2.06 to be given a sensible meaning, it must be read to grant a license not only to the literally described patent applications, but also to the progeny of those licensed applications which depend on such applications for their validity.

As discussed in Part II above, a patent applicant can obtain the benefit of an earlier filing date for later-filed claims if those claims were described in a prior application. At least two general mechanisms are available for this process: the inventor may abandon his original application and file continuation or divisional applications under 35 U.S.C. § 120, or he may simply amend his original application under 35 U.S.C. § 132.

---

**3.** Even if the validity of the '104 patent were not at issue, BP would be estopped from asserting that the '73 application does not describe the claims of the '104 patent because this would contradict the arguments BP made to the Patent Office, under oath, in order to obtain the '104 patent. *See Long v. Knox,* 155 Tex. 581, 291

S.W.2d 292, 295 (1956) (party is estopped to make assertions contrary to what it alleged under oath in a former proceeding); *Zapata Gulf Marine v. P.R. Maritime Shipping Auth.,* 731 F.Supp. 747, 750 (E.D.La.1990) (in Fifth Circuit, estoppel applies equally to positions taken in prior quasi-judicial administrative proceedings).

If the inventor takes the former course, as here, the patent will "bear" the later filing date of the continuation patent, while under the latter route the patent "bears" the original filing date of the initial application.

Now suppose a hypothetical inventor licensed the use of all of his patent applications "bearing filing dates" prior to the date of agreement. On the date of agreement, the inventor owned a pending application for a patent on widgets. Clearly, the widget patent application is licensed. Just as clearly, if the inventor successfully amended the claims of his application, the application would still be licensed.

Under BP's interpretation of this agreement, however, the licensee would lose its rights to the widget application if the inventor, at his sole discretion, simply abandoned the original application and filed a "continuation" application. This continuation might even be identical to the original application. Although for purposes of patentability the continuation will be treated as if had been filed before the license agreement, a literalist interpretation of the agreement would find the licensee disenfranchised because the new application technically has a later filing date. BP suggests that this is the right result for the sole reason that "effective filing date" is a "term of art," and if the parties had meant "effective" they should have said so.

In support of this interpretation, BP first offers the "testimony" of a patent licensing specialist, Robert J. Wagner, who stated by affidavit that § 2.06 refers only to actual filing dates, "and does not include Continuations, [Continuations–in–Part], Divisionals etc." However, when asked at deposition to explain this opinion, Mr. Wagner flatly contradicted himself:

> Q. Now, referring once again to 206 [sic], would you believe that if there was an application in existence prior to the signing of that agreement between Celanese and Monsanto, which application was licensed under 206, that Monsanto could disenfranchise Celanese for that license by merely filing a continuation application after the date?
>
> . . . . .
>
> A. No, I don't believe you would disenfranchise the license.

Wagner Dep., pp. 106:12–107:3. In response to a similar hypothetical, asking if Celanese would retain a license under a later-filed "reissue" patent, Wagner answered: "That would be my interpretation or the equity of it, yes." *Id.* at 63:20–64:5. He also agreed to Celanese's interpretation of § 2.06 with regard to divisional applications. *Id.* at 69:18–71:8. In other words, BP's own "expert" on license interpretation agreed that the term "bearing filing dates" must be read to include later-filed continuation, reissue, or divisional applications which would have been licensed under the parent application.

Later in his deposition, Wagner simply retreated to the "field of agreement" argument, stating that the '73 application does not fit within the above hypotheticals because it did not describe a process for making acetic acid, and hence it would not have been licensed. As discussed above, the Court is inclined to agree with this assertion. The assertion's truth, however, would render the '104 patent invalid and the license issue moot.

■ BP also attempts to bolster its interpretation with the affidavit of Proctor Avon, who negotiated the license agreement in 1975 for Monsanto. In this affidavit, Mr. Avon swore:

> [H]ad Celanese insisted on including language in Section 2.06 that would have granted Celanese a license under future Monsanto patent applications, including, [sic] divisional, continuation or reissue applications, I would not have approved the inclusion of Section 2.06 in the agreement.

Avon Aff. ¶ 10. Such a statement of Mr. Avon's subjective intent is, of course, completely irrelevant to the interpretation of the objective intent expressed in this agreement. *Meyerland Comm. Improvement Ass'n v. Temple,* 700 S.W.2d 263, 267 (Tex.App.— Houston [1st Dist.] 1985, writ ref'd n.r.e.); *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968).

■ Of more concern to the Court, however, is that again this affidavit proved to be a gross misrepresentation, if not an outright

fabrication, of Mr. Avon's true opinion. At Mr. Avon's subsequent deposition, he testified that he did not know what he would have done if Celanese had insisted on including continuation and divisional applications that were filed after the agreement; that in fact he had "no idea" what continuation applications are; that he did not know what divisional applications are; that he did not know what reissue applications are; and that he "very likely" did not know the meanings of those terms when he signed the affidavit. Avon Dep., pp. 21:8–19, 29:4–32:9. It should be plain that a party cannot create a genuine issue for trial with an affidavit which the affiant later flatly contradicts at deposition. *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir.1984); *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980). Rather, such circumstances only put the offering party at risk for suffering severe sanctions.[4]

 Finally, BP argues that Celanese's interpretation would "rewrite" the licensing agreement. The Court is well aware of the principle that, in interpreting a contract, language should not be added which the parties did not include. *Dempsey v. King*, 662 S.W.2d 725, 728 (Tex.App.—Austin 1983, writ dism'd). However, contract language should not be given its strict grammatical meaning if it definitely appears that the intention of the parties would be thereby defeated. *Cf. Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex.1966). Rather, under Texas law:

> A court should construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served.... Courts will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive. Courts will not declare a forfeiture unless they are compelled to do so by language which can be construed in no other way.

*Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 530 (Tex.1987) (citations omitted).

 BP's interpretation of § 2.06 would only permit the licensor to conduct a legalized shell game. Such a meaning is not one which "would be attached ... by a reasonably intelligent person acquainted with all operative usages...." *City of Pinehurst*, 432 S.W.2d at 518. As a matter of law, the only reasonable interpretation of a license for patents and patent applications "bearing filing dates" prior to a given date is that the license extends to the progeny of such patents and applications which depend upon the parents' filing dates for their validity. Accordingly, if the '104 patent is a valid continuation of the '73 application and claims Celanese's process for making acetic acid, then Celanese is licensed to use its process under § 2.06 of the licensing agreement.

## D. Conclusion

BP has conceded (and is estopped from arguing otherwise) that the '104 patent is valid only if it can claim the benefit of the filing date of the '73 application. Therefore, if the '104 patent is valid, the '73 application described the inventions claimed in the '104 patent. Hence, if Celanese's process of making acetic acid would infringe the '104 patent, the '73 application must have described a process for making acetic acid. Therefore, the '73 application is within the defined "Field of This Agreement" of the 1975 license.

The lithium iodide process developed by Celanese is a "technical improvement" it developed for the production of acetic acid in its plant, as contemplated by § 2.06 of the license. Substituting these defined terms into § 2.06, Monsanto granted Celanese "a license under [the '73 application] ... to the extent necessary for LICENSEE to use [the lithium iodide process] for the production of acetic acid...." No reasonable interpretation of this grant would allow BP to disenfranchise Celanese's license to the '73 application by simply abandoning the application and filing a continuation application 13 years later. Therefore, if the '104 patent is indeed valid, Celanese is licensed to use the lithium iodide process which the '104 patent claims through the '73 application. Accordingly,

---

4. In fact, if the terms of the license itself did not dictate judgment for Celanese as a matter of law, the Court would be inclined to consider whether striking BP's answer to Celanese's license claim would be the appropriate deterrent to submissions such as the Wagner and Avon affidavits.

Celanese's motion for summary judgment with respect to the issue of infringement, based on its license, is **GRANTED.**

\* \* \* \* \* \*

Defendant's other arguments do not merit discussion. In sum, then, Plaintiffs' motion for summary judgment on the issue of validity is **DENIED.** Plaintiffs' motion for summary judgment on the issue of infringement, based on their license to use the allegedly infringing process, is **GRANTED.** Because this ruling ends the sole substantial controversy affecting the rights of these parties, all other outstanding substantive and procedural issues are rendered **MOOT.** Accordingly, all claims other than those for costs and ·attorney's fees are **DISMISSED.**

If the Plaintiffs are entitled to recover their costs and attorney's fees, and intend to pursue this claim,·it is **ORDERED** that the Plaintiffs file, within 10 days of the date of this Order: (1) a concise statement of the authority for such an award; (2) billing records for recoverable time and expenses, with sufficient detail to allow the Court to review the propriety of each claim; and (3) an affidavit setting forth the reasonable hourly fee of Plaintiffs' counsel, and any appropriate lodestar enhancement factors which might be applicable under *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). Whether or not Plaintiffs intend to pursue attorney's fees, Plaintiffs are also **ORDERED** to file, within 10 days of the date of this Order, a proposed final judgment in this case. Defendant will have 10 days after the filing of these documents in which to respond.

The Court is aware that the parties to this case are currently embroiled in at least one other patent dispute. Plaintiffs are **ORDERED** to strictly limit any fee request to time and cost expended specifically on this cause, including reasonable apportionments of time spent jointly on this cause and others.

If the parties can present to the Court *compelling* and *relevant* new evidence or legal authority, which they *could not* through the exercise of due diligence have presented on original submission of these motions, the parties are, of course, invited to bring these to the Court's attention. Otherwise, the par-

ties are **ORDERED** to file no further pleadings on these issues in this Court, including motions to reconsider and the like. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

IT IS SO ORDERED.