65 F.3d 188
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
HOECHST CELANESE CORPORATION and Hoechst Celanese Chemical
Group, Inc., Plaintiffs/Cross-Appellants,
v.
BP CHEMICALS LIMITED, Defendant-Appellant.
 Nos. 94-1362, 94-1370.
 United States Court of Appeals, Federal Circuit.
 Aug. 25, 1995.
 
 Before NIES, Circuit Judge, COWEN, Senior Circuit Judge, and SCHALL, Circuit Judge.
 Opinion for the court filed by Circuit Judge SCHALL.
 Dissenting opinion filed by Circuit Judge NIES.
 DECISION
 SCHALL, Circuit Judge.
 
 
 1
 BP Chemicals Limited (BP) appeals, and Hoechst Celanese Corporation and Hoechst Celanese Chemical Group, Inc. (Celanese) cross-appeal, from the May 9, 1994 final judgment of the United States District Court for the Southern District of Texas in Docket No. G-92-499. Hoechst Celanese Corp v. BP Chems. Ltd., 844 F.Supp. 336 (S.D.Tex.1994). The district court denied Celanese's motion for summary judgment of invalidity of BP's U.S. Patent No. 5,003,104 (the '104 patent), granted Celanese's motion for summary judgment of noninfringement based on Celanese's license defense, and dismissed BP's counterclaim for patent infringement and all other pending claims. The court awarded Celanese $2,020,913 in attorney's fees and costs due to BP's litigation misconduct. We affirm in part, vacate in part, and remand.
 
 DISCUSSION
 I. Background
 
 2
 These appeals arise from Celanese's declaratory judgment action filed on October 16, 1992, against BP, in which Celanese claimed that its production of acetic acid did not infringe the '104 patent, and BP's counterclaim filed on January 11, 1993 seeking over $180,000,000 in damages for patent infringement. On August 6, 1993, Celanese filed separate motions for summary judgment on the grounds that (i) the '104 patent is invalid, and (ii) Celanese did not infringe the '104 patent because it is licensed by BP's predecessor in interest, the Monsanto Company (Monsanto), under that patent.
 
 
 3
 The district court denied Celanese's motion for summary judgment of invalidity, but granted its motion for summary judgment of noninfringement. The court also determined that this was an exceptional case, and awarded Celanese $2,020,913 in attorney's fees and costs. The court then issued its final judgment dismissing BP's counterclaim and all other pending claims.
 
 II. Merits
 A.
 
 4
 Celanese argued before the district court, and argues before this court on cross-appeal, that the '104 patent is not entitled to the August 27, 1973 filing date granted to the application from which the '104 patent claimed priority under 35 U.S.C. Sec. 120. Without benefit of the earlier filing date, BP has admitted that intervening prior art renders the '104 patent invalid. Celanese argues that the '104 patent is not entitled to the earlier filing date because it does not meet the "written description" requirement of 35 U.S.C. Sec. 112, in that "the invention claimed by BP in [the '104 patent] was not described in the 73 application."
 
 
 5
 We have considered Celanese's arguments on this issue, and find them to be without merit.[1] The district court properly refused to grant summary judgment of invalidity based on the record before it; we affirm the denial of summary judgment.
 
 B.
 
 6
 Celanese contends that it does not infringe any claim in the '104 patent because Monsanto granted Celanese a license under that patent. Section 2.06 of the 1975 license agreement between Monsanto and Celanese states, in pertinent part, as follows:
 
 
 7
 MONSANTO ... hereby grant[s] to LICENSEE a license under any of its United States patents and patent applications within the FIELD OF THIS AGREEMENT bearing filing dates prior to the DATE OF THIS AGREEMENT for the sole purpose of and only to the extent necessary for LICENSEE to use technical improvements developed by LICENSEE for the production of acetic acid in the PLANT....
 
 
 8
 Hence, for Celanese to be licensed under (and thus not infringe) the '104 patent, (i) the '104 patent must be within the "FIELD OF THIS AGREEMENT," (ii) the patent must bear a "filing date" prior to the date of the license agreement (July 1, 1975), and (iii) Celanese must have developed a technical improvement. The district court found that each condition was satisfied, and that Celanese was licensed under the '104 patent.
 
 
 9
 BP contests the first two of the district court's three findings. BP argues that the '104 patent was not within the field of the agreement, because it is a continuation of the 1973 application, which BP contends was not licensed. BP also argues that the '104 patent does not "bear a filing date" prior to July 1, 1975, because it was actually filed on October 31, 1988. Accordingly, it disagrees with the district court's interpretation of the "bearing filing dates" clause, which was that that clause included both actual filing dates and effective filing dates granted on the basis of an earlier-filed parent application under 35 U.S.C. Sec. 120.
 
 
 10
 We cannot say that the district court erred in holding that the invention of the '104 patent was within the field of the agreement, and that the '104 patent bears a filing date prior to the date of the license agreement. We therefore affirm the court's grant of summary judgment that Celanese has not infringed the '104 patent because it was licensed under that patent by BP's predecessor in interest.
 
 III. Attorney's Fees
 A.
 
 11
 A trial court may award attorney's fees to the prevailing party in "exceptional" cases. 35 U.S.C. Sec. 285 (1988). A case may be exceptional due to "misconduct during litigation." Beckman Instruments Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551, 13 USPQ2d 1301, 1304 (Fed.Cir.1989). The amount of an attorney's fee award imposed for litigation misconduct must bear a reasonable relationship to the extent of the misconduct. Read Corp. v. Portec, Inc., 970 F.2d 816, 831, 23 USPQ2d 1426, 1438-39 (Fed.Cir.1992).
 
 
 12
 We have stated that "[d]eciding a motion for attorney fees under ... Sec. 285 ... requires a two-step analysis." J.P. Stevens Co. v. Lex Tex Ltd., 822 F.2d 1047, 1050, 3 USPQ2d 1235, 1237 (Fed.Cir.1987). The district court must determine "whether the case is 'exceptional'; if it is, then it is within the court's discretion to award attorney's fees to the prevailing party." Id. On appeal, we review the factual underpinnings of the "exceptional" case determination under the clearly erroneous standard. Reactive Metals & Alloys Corp. v. ESM, Inc., 769 F.2d 1578, 1583, 226 USPQ 821, 824 (Fed.Cir.1985). Only if the factual and legal underpinnings withstand scrutiny does this court reach the question of whether the district court abused its discretion in making an award. Id. Thus, "the issue of discretion comes into play, not in determining whether the case is exceptional, but in deciding, with respect to an exceptional case, whether the award of attorney fees was appropriate and whether the amount of the award was reasonable." Id.
 
 B.
 
 13
 The district court concluded that it was not "extraordinary" for BP to argue that Celanese was not licensed and that the '104 patent was not invalid. Rather, the court based its finding that the case was exceptional under Sec. 285 on "the manner in which BP attempted to bolster [its] claims" on the licensing and validity issues. The court cited five instances of BP's alleged litigation misconduct. We review these "factual underpinnings" under the clearly erroneous standard.
 
 1. The Wagner Affidavit and Deposition
 
 14
 In support of the exceptional case finding, the district court found that BP acted in bad faith in relying on the affidavit of its patent expert, Robert Wagner. BP relied on Mr. Wagner's affidavit, along with other material, to support its opposition to Celanese's motion for summary judgment on the license issue. Section 2.06 of the license agreement grants a license under certain patents and patent applications "bearing filing dates" prior to the date of the agreement. BP argued that the "bearing filing dates" clause should be interpreted to refer to the actual filing date of a patent application, not the effective filing date, and that the agreement therefore does not include future applications such as continuations. Mr. Wagner swore in his affidavit that the "bearing filing dates" clause excluded continuation applications. In a subsequent deposition, Celanese succeeded in provoking Mr. Wagner to admit that the "bearing filing dates" clause would not exclude a continuation of a licensed application. Celanese then filed a motion to strike the portions of Mr. Wagner's affidavit that conflicted with his deposition testimony.
 
 
 15
 In response to Celanese's motion to strike, BP sought to clear up the inconsistencies between Mr. Wagner's affidavit and his deposition testimony by explaining that BP was arguing that the "bearing filing dates" clause excluded only continuations of non-licensed applications. BP asserted that Mr. Wagner's admission was in response to a purely hypothetical question because BP has always taken the position that the 1973 application was not licensed. Although BP did clear up the discrepancy, it did not do so until after Celanese nailed down Mr. Wagner in a deposition and filed its motion to strike. The fact remains that Mr. Wagner's affidavit on its face conflicts with his deposition testimony. The only way the inconsistency is resolved is by BP's after-the-fact explanation. Once BP admitted that its argument was limited to excluding only continuations of non-licensed applications, Mr. Wagner's affidavit and deposition testimony are not inconsistent, but without BP's explanation, Mr. Wagner's affidavit and deposition testimony are sharply inconsistent. The district court was not clearly erroneous in finding that Mr. Wagner's deposition testimony contradicted certain statements in his affidavit.
 
 
 16
 In addition, Mr. Wagner stated in his affidavit that Celanese was not licensed under the '104 patent because "the use of lithium iodide was not part of the Monsanto commercial process and the Agreement was never intended to license any Monsanto R & D work." In his subsequent deposition, Mr. Wagner admitted that section 2.06 of the license agreement did not have any commercial use restriction, and admitted that section 2.06 could grant a license under Monsanto's R & D work. The district court recognized Mr. Wagner's inconsistent statements and found that it was "ludicrous" for BP and its experts to assert that the lithium iodide process was excluded from the license agreement because it was part of Monsanto's non-commercial R & D work. This finding of fact is not clearly erroneous.
 
 
 17
 We cannot say that the district court's findings of fact regarding Mr. Wagner's affidavit are clearly erroneous. Neither can we say--although the case is close--that the court erred in concluding that there was litigation misconduct on the part of BP with regard to Mr. Wagner's affidavit. However, the court's conclusions with respect to the remaining alleged instances of litigation misconduct do not pass similar muster.
 
 2. The Avon Affidavit
 
 18
 The court found that BP engaged in litigation misconduct by relying on the affidavit of its licensing expert, Proctor Avon. In his affidavit, Mr. Avon swore that had Celanese insisted in 1975 on receiving a license under continuation and divisional applications filed after the agreement, "I would not have approved." Mr. Avon subsequently testified at his deposition, in response to substantially the same question, that "he did not know what he would have done," according to the court. Mr. Avon also testified at his deposition that he did not know what "continuation" or "divisional" patent applications were, and that he likely did not know the meaning of those terms when he signed the license agreement. Thus, the court concluded that the "affidavit proved to be a gross misrepresentation, if not an outright fabrication, of Mr. Avon's true opinion." Hoechst Celanese, 844 F.Supp. at 345-46, 30 USPQ2d at 1840.
 
 
 19
 We disagree. The record supports the conclusion that Mr. Avon was not a patent attorney, and that, during the license agreement negotiations, he relied on the assistance of James Logamasini, who was a patent attorney, for advice on patent matters. Mr. Avon swore in his affidavit, and did not testify differently at his deposition, that he did not believe that Celanese was licensed under continuation applications. In addition, at his deposition, Mr. Logamasini stated that there was nothing in Mr. Avon's affidavit with which he disagreed. Mr. Avon's failure to understand or recollect the meaning of certain patent terms of art does not make BP's reliance on his affidavit litigation misconduct. Thus, we cannot agree that the record supports the district court's characterization of the affidavit as "a gross misrepresentation, if not an outright fabrication, of Mr. Avon's true opinion." The court's determination that BP's reliance on Mr. Avon's affidavit represented litigation misconduct is clearly erroneous.
 
 3. License and Invalidity
 
 20
 According to the district court, BP could not reasonably argue that the 1973 application was not within the field of the agreement, because this argument was inconsistent with its contentions on the validity issue--namely, that the '104 patent was not invalid because it contained a written description under 35 U.S.C. Sec. 112 that had support in the 1973 application. The court concluded that the 1973 application must have disclosed a process for making acetic acid for the '104 patent to be valid under Sec. 112, and that if it disclosed a process for making acetic acid, it must also have been within the field of the agreement. Stated differently, the court concluded that the disclosure of the 1973 application controls both the validity of the '104 patent, and whether the 1973 application was within the field of the agreement and therefore licensed.
 
 
 21
 BP's position, which the court labelled "ridiculous" and "absurd," was that the claims of the 1973 patent application determine whether that application was within the "FIELD OF THIS AGREEMENT," whereas the disclosure of the 1973 patent application determines whether that application provides support under Sec. 112 for the claims of the '104 patent. We cannot conclude, as the district court did, that BP's position on this issue was so clearly without merit that prosecuting its case on that theory was litigation misconduct.
 
 
 22
 BP's position, broken down into its component parts, is this. A license agreement grants to the licensee the right to be free from a lawsuit for patent infringement.[2] A patent infringement lawsuit is predicated on infringement of the claims, not infringement of the disclosure.[3] BP therefore argues that a licensor's promise not to sue, and hence the scope of a license agreement, must be measured by the claims and not by the disclosure. BP's position is not so manifestly improper an interpretation of the law as to warrant a finding of litigation misconduct. The district court's contrary finding is clearly erroneous.
 
 4. Cotton Declaration
 
 23
 In its decision denying Celanese's motion for summary judgment of invalidity, the district court determined that BP submitted expert testimony on the issue of validity under 35 U.S.C. Sec. 112 based on the wrong legal standard. Dr. F.A. Cotton, BP's chemistry expert, stated in his declaration that an artisan would have known that certain substitutions of materials could have been made to arrive at the claimed invention. The court stated that:
 
 
 24
 the test for the written description requirement is not whether a skilled artisan would have known that lithium iodide was "suitable" in similar processes; the test is whether the artisan would have known, from reading the description, that the inventor of the '73 application did know of this suitability--and hence had possession of this invention.
 
 
 25
 Hoechst Celanese, 844 F.Supp. at 340, 30 USPQ2d at 1836 (emphasis in original). The court determined that Dr. Cotton's opinion applied the former (improper) standard, instead of the latter.
 
 
 26
 The distinction between what one skilled in the art would understand upon reading a written description, and what one skilled in the art would understand that the inventor understood is a difficult one to draw. That alone weighs against a finding that Dr. Cotton's declaration, which was ostensibly prepared by a technical expert (Cotton) rather than by a legal one, was somehow misleading or representative of misconduct on the part of BP.
 
 
 27
 More importantly, BP persuasively argues that Dr. Cotton's opinion did in fact address the proper standard. It contends that under our decision in United States Steel Corp. v. Phillips Petroleum Co., 865 F.2d 1247, 1251, 9 USPQ2d 1461, 1465 (Fed.Cir.1989), "support need be found for only the claimed invention, in view of how one skilled in the art at that time would construe the claims and would read its specification," and that Dr. Cotton's opinion applied that statement of the law. Dr. Cotton's declaration is in accord with our holding in Phillips. In his declaration, after reading the specification, Dr. Cotton stated: "[T]he '73 application reasonably conveys to one skilled in the art the carbonylation process described in claim 1 of the '104 patent, as of the August 27, 1973 filing date of the '73 application." See In re Spina, 975 F.2d 854, 857, 24 USPQ2d 1142, 1144 (Fed.Cir.1992) ("Spina's specification 'must be sufficiently clear that persons of skill in the art will recognize that [he] made the invention having those limitations,' ") citing Martin v. Mayer, 823 F.2d 500, 505, 3 USPQ2d 1333, 1337 (Fed.Cir.1987)); In re Wertheim, 541 F.2d 257, 262, 191 USPQ 90, 96 (CCPA 1976). The district court clearly erred in holding that BP's reliance on Dr. Cotton's declaration, because it purportedly espoused the "wrong legal standard," represented litigation misconduct by BP.
 
 5. BP's Conduct Before Trial
 
 28
 Finally, the district court found that "BP did not act in good faith in making the threats that led to the filing of the ... action ... and that Celanese's best recourse was to file suit." However, except for referring to one statement by a BP official that BP "would have to proceed with legal proceedings," the district court did not make any factual findings with respect to events immediately preceding Celanese's initiation of the lawsuit. Under these circumstances, the district court's finding that BP acted in bad faith before the suit was filed is clearly erroneous.
 
 C.
 
 29
 Thus, we hold that only one of the five instances of litigation misconduct cited by the district court serves as a proper basis for an award of attorney's fees. That litigation misconduct was sufficient to render the case exceptional under 35 U.S.C. Sec. 285. The district court only had discretion to award attorney's fees commensurate with that misconduct. See Read, 970 F.2d at 831, 23 USPQ2d at 1438-39.
 
 
 30
 The Wagner affidavit is dated August 24, 1993. As noted above, it was submitted by BP in support of its September 7, 1993 response to Celanese's motion for summary judgment. Celanese took Mr. Wagner's deposition on October 20, 1993. Thereafter, on November 17, 1993, it filed its motion to strike portions of the affidavit as being inconsistent with Mr. Wagner's deposition testimony. BP filed a memorandum in opposition to the motion to strike on December 7, 1993, in which it explained that Mr. Wagner's affidavit and his deposition testimony were not inconsistent. No papers were filed by either party in connection with the motion to strike subsequent to BP's December 7 memorandum.
 
 
 31
 The Wagner affidavit was in issue from the date of the Wagner deposition--October 20, 1993--until December 7, 1993, when BP set forth its interpretation of the affidavit and deposition in its memorandum in opposition to the motion to strike. Celanese's attorney's fees and costs in connection with taking Mr. Wagner's deposition and in connection with preparing and filing Celanese's motion to strike are properly allocable to BP's litigation misconduct, and thus are within the district court's discretion.
 
 
 32
 Based on the foregoing, we hold that Celanese is entitled to recover the attorney's fees and costs it incurred during the period from and including October 20, 1993, to and including November 17, 1993, (i) in connection with taking Mr. Wagner's deposition; and (ii) in connection with preparing and filing the motion to strike. The district court had no discretion to award attorney's fees and costs that did not result from taking Mr. Wagner's deposition or from preparing and filing the motion to strike portions of the Wagner affidavit.
 
 
 33
 In sum, we affirm the district court's denial of Celanese's motion for summary judgment of invalidity. We also affirm that portion of the final judgment which states that Celanese is "licensed pursuant to the terms of the certain License Agreement dated July 1, 1975, to practice the subject matter claimed in United States Patent No. 5,003,104." We vacate that portion of the final judgment that awards Celanese attorney's fees in the amount of $2,020,913.00, plus taxable costs. The case is remanded to the district court for a computation of the fees and costs to which Celanese is entitled in accordance with the parameters set forth in the preceding paragraph. In all other respects, the final judgment is affirmed.
 
 
 34
 Each side shall bear its own costs.
 
 
 35
 NIES, Circuit Judge, dissenting-in-part.
 
 VALIDITY
 
 36
 The district court denied Celanese's motion for summary judgment of invalidity of the '104 patent on the ground that the issue required trial. After granting summary judgment of non-infringement, the district court dismissed the invalidity count on the ground that the issue was moot. Under Cardinal Chem. Corp. v. Morton this is incorrect. 113 S.Ct. 1967, 1975, 26 USPQ2d 1721, 1727 (1993) ("A party seeking a declaratory judgment of invalidity presents a claim independent of the patentee's charge of infringement."). The panel affirms the denial of summary judgment on validity and seems to assume that this disposes of the count in the complaint. However, under Cardinal, Celanese is entitled to litigate that issue on remand.
 
 INFRINGEMENT
 
 37
 I agree with the majority that Celanese is licensed to practice the invention claimed in the '104 patent and that the use of the Wagner affidavit constitutes grounds for the district court's finding that the case was exceptional. However, I conclude that the district court had ample grounds upon which to find the case exceptional in addition to the incident on which the majority affirms. In any event, once a case is found "exceptional," the district court may in its discretion award reasonable fees for the case, not just the incidents. The majority parses too fine.
 
 ATTORNEY FEES
 
 38
 Unlike the majority, I conclude that the district court properly found eight grounds upon which to base its "exceptional case" determination and I would affirm the district court's judgment regarding the amount of attorney fees through this phase of the litigation. Why the majority ignores two findings made by the district court in determining that the case was exceptional and overturns one unchallenged finding is a mystery to me. Whether Congress wisely or unwisely authorized fee shifting in exceptional patent cases is not a determination left to this court. Congress has spoken and we are not permitted to throttle the district court's discretion.
 
 
 39
 As the district court noted, BP sought $180,000,000 in damages from Celanese and was well aware of the magnitude of the litigation and possible fees. Also, the district court properly determined that the case was exceptional based on the totality of the circumstances. Unlike our review of this case, based primarily on briefs and a written record, the district court had multiple interactions with the parties and was in the best position to judge the overall conduct of BP's litigation. The decision to award attorney fees was not an abuse of discretion and was well supported by the numerous examples of misconduct that permeated the entire case.
 
 
 40
 Our standard of review, the clearly erroneous standard for the underlying factual findings, is of limited scope. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.... If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985). I believe the majority reweighs the evidence, instead of reviewing the findings.
 
 EXCEPTIONAL CASE FACTORS
 1. Wagner Affidavit
 
 41
 I agree with the majority that use of the Wagner affidavit justified two findings of litigation misconduct: one, a finding of improper use of the affidavit when the deposition testimony contradicted the earlier written affidavit and the other, a finding that one defense offered in the affidavit was frivolous.
 
 2. Avon Affidavit
 
 42
 The Avon affidavit contained improper assertions that BP's counsel should not have used and should have withdrawn. Avon claimed in the affidavit that he did not intend to grant any license on divisional, continuation or reissue applications. Yet Avon later at deposition declared that he did not understand any of those terms. The majority reasons that because Avon was not an attorney, his failure to understand what he signed somehow overcomes BP's counsel misconduct in drafting and relying on that affidavit. The issue is not whether Avon improperly swore to an affidavit. Instead the issue is whether BP's counsel had Avon sign an affidavit without advising Avon of its legal impact, and when faced with the inconsistency between the Avon affidavit and the Avon deposition, counsel improperly failed to withdraw that affidavit. The district court correctly found that BP committed litigation misconduct in connection with the Avon affidavit.
 
 3. Cotton Declaration
 
 43
 Cotton stated in his declaration filed in opposition to Celanese's motion for summary judgment of invalidity that the 1973 application supported the invention of the claims which ultimately issued. In Cotton's later deposition he conceded that the claims were not described therein as required by the statute. 35 U.S.C. Sec. 112. The district court's finding that Cotton's deposition testimony refutes the earlier declaration stands unchallenged. The majority forgives an affiant because the declaration was based on an incorrect legal standard and was "ostensibly" prepared by a technical, not legal person. To believe that during litigation a major corporation represented by experienced counsel would submit an affidavit prepared independent of litigation counsel's consent and guidance defies credibility. But in any event, it is the responsibility of counsel to review and verify material submitted to the court.
 
 
 44
 Contrary to the majority's holding, Cotton's declaration and counsel did urge an incorrect legal standard for determining written description. BP utilized Cotton's declaration to state that the test for determining whether the written description requirement had been met was "that the '73 application reasonable conveys to one skilled in the art in August, 1973 the carbonylation processes described in [the '104] claims." While that standard is correct for enablement, it is an incorrect standard for written description. As stated in Vas-Cath Inc. v. Mahurkar:
 
 
 45
 This Court in Wilder [736 F.2d 1516, 222 USPQ 369 (Fed.Cir.1984) ] (and the CCPA before it) clearly recognized and we hereby reaffirm, that 35 USC 112, first paragraph, requires a "written description of the invention" which is separate and distinct from the enablement requirement. The purpose of the "written description" requirement is broader than to merely explain how to "make and use"; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention.
 
 
 46
 19 USPQ 1111, 1117 (Fed.Cir.1991) (emphasis in original).[1] BP's suggestion that U.S. Steel v. Phillip Petroleum, 865 F.2d 1247, 1251, 9 USPQ2d 1461, 1465 (Fed.Cir.1989) states the proper test for the written description misses the mark. Phillips merely confirms the proposition stated in In re Koller, 613 F.2d 819, 823, 204 USPQ 702, 706 (CCPA 1977) that subsequent art should not determine what a skilled artisan would have known earlier. Further, in Phillips, this court affirmed the trial court's finding that the earlier application "would indicate to one skilled in the art that [the inventor] was in possession of a new [invention]." Phillips, 865 F.2d at 1250, 9 USPQ2d at 1463. Moreover, Phillips relies on Ralston Purina, which clearly holds that the "inventor had possession" at the time of the earlier application of the later filed claims. Stating that the test for determining the written description remains unclear rings hollow.
 
 
 47
 Cotton's later deposition repudiating his earlier written declaration stands unchallenged and clearly supports a finding of BP's litigation misconduct.
 
 4. Frivolous Defenses
 
 48
 The district court also found that BP put forth "frivolous defenses" concerning what was licensed. First, BP argued that the 1973 application, upon which Celanese claimed a license agreement, did not claim a process for making acetic acid, i.e. the accused process. If the application did not teach that process, then the '104 patent would be invalid as a matter of law, because BP could not then claim the 1973 priority date. As the district court stated, this argument, as well as its argument on research and development work, is absurd.
 
 5. Pre-litigation Conduct
 
 49
 The district court found that BP did not act in good faith when threatening litigation. Although BP never challenges this finding, the majority, nevertheless, rules that this finding is clearly erroneous.
 
 6. Attorney-client Privilege
 
 50
 Another finding supporting the exceptional case determination is that although BP claimed that it threatened suit in good faith reliance on advice of counsel, BP claimed privilege when asked to show the basis of those opinions. The district court properly rejected BP's assertions, put forth without any proof. The district court noted: "Amazingly, however, BP attempts to support this allegation with excerpts from three depositions in which BP refused to divulge the bases of these opinions, claiming attorney-client and work-product privileges." Moreover, the only evidence put forth by BP showed that no good faith supported its threats. Once again, BP does not challenge this finding and the majority does not address it.
 
 7. Conclusion
 
 51
 In conclusion, on the exceptional case determination, the district court made numerous findings that support its ultimate finding that the case was exceptional. Three findings go unchallenged, and the majority upholds two others. That is ample grounds for affirmance, even without the additional instances which I would affirm. BP counsel took risks in arguing various patently untenable positions and lost. They were properly found to have engaged in litigation misconduct.
 
 ABUSE OF DISCRETION
 
 52
 Although the majority does hold that the district court properly found that the case was exceptional, the majority imposes a novel remedy, treating the award of attorney fees as if a sanctions case. The majority attempts to narrow the award to match exactly, down to the days, what fees are recoverable, for a specific finding of misconduct. A sanctions case may warrant an exact parallel between fees and the sanction, but Sec. 285 does not so limit a district court, in its discretion to award reasonable fees to a prevailing party for the case once the entire case is declared exceptional.
 
 
 53
 Celanese submitted motions for summary judgment on validity and non-infringement that were opposed in part with frivolous defenses and repudiated affidavits. Celanese was forced to continue preparations for trial throughout the time the summary judgment motions were pending. Celanese was also forced to do additional work to refute BP's position. Undoubtedly, work was expended to prepare for the depositions of Cotton, Wagner and Avon, but under the majority's novel remedy, none of that work would be compensable. Also, all the work that went into preparing for trial would not be compensable, even though, had BP not answered the summary judgment motions improperly, the case might have ended much sooner. In the end, the majority is saying that the district court cannot adequately judge the conduct of the parties before the court, but that an appellate court can read briefs and a cold record to better determine the appropriateness of a litigation counsel's conduct.
 
 
 54
 If the issue of attorney fees is properly before us, in view of the lack of a final judgment in the case, I would affirm the award of the entire amount of attorney fees so far accumulated.
 
 
 
 [1]
 The denial of a motion for summary judgment ordinarily is not appealable to this court. See, e.g., Syntex Pharmaceuticals Int'l, Ltd. v. K-Line Pharmaceuticals, Ltd., 905 F.2d 1525, 1526, 15 USPQ2d 1239, 1239-40 (Fed.Cir.1990) (denial of "motion for summary judgment of invalidity is ... not a final judgment and therefore not appealable."). However, this court will entertain such an appeal if the court has pendant appellate jurisdiction. See Intermedics Infusaid, Inc. v. Regents of Univ. of Minn., 804 F.2d 129, 134, 231 USPQ 653, 657 (Fed.Cir.1986) ("[T]he major factor in determining whether to exercise [pendant appellate] jurisdiction is the extent that review of the appealable order will involve consideration of factors relevant to the otherwise nonappealable order."). We will assume for purposes of analysis that this court has such jurisdiction over the denial of Celanese's motion for summary judgment of invalidity
 
 
 [2]
 Fromson v. Western Litho Plate & Supp. Co., 853 F.2d 1568, 1576, 7 USPQ2d 1606, 1613 (Fed.Cir.1988) ("A license is fundamentally an agreement by the patent owner not to sue the licensee.")
 
 
 [3]
 Environmental Instruments, Inc. v. Sutron Corp., 877 F.2d 1561, 1564, 11 USPQ2d 1132, 1134 (Fed.Cir.1989) ("The claims alone delimit the right to exclude; only they may be infringed.")
 
 
 [1]
 Ralston Purina Co. v. Far-Mar-Co., Inc., 772 F.2d 1570, 1575, 227 USPQ 177, 179 (Fed.Cir.1985) ("the application relied upon 'reasonably conveys to the artisan that the inventor had possession at the time of the later claimed subject matter.' ") (quoting In re Kaslow, 707 F.2d 1366, 1375, 217 USPQ 1089, 1096 (Fed.Cir.1983)). See 2 Donald S. Chisum, Patents Sec. 7.04[e] at 7-157. (1994) and many additional cases cited therein